UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x
IN RE MERIDIAN FUNDS GROUP          :
SECURITIES & EMPLOYEE               :          09-MD-2082 (TPG)
RETIREMENT INCOME SECURITY ACT      :
(ERISA) LITIGATION                  :
------------------------------------------x
                                    :
THE R.W. GRAND LODGE OF FREE &      :
ACCEPTED MASONS OF                  :
PENNSYLVANIA,                       :
                                    :
                    Plaintiff,      :
                                    :
        - against -                 :          09-CV-7099 (TPG)
                                    :
                                    :          **OPINION**
MERIDIAN CAPITAL PARTNERS, INC.,    :
MERIDIAN DIVERSIFIED FUND, LTD.,    :
MERIDIAN DIVERSIFIED FUND           :
MANAGEMENT, LLC, WILLIAM H.         :
LAWRENCE, and ERNST & YOUNG LLP,    :
                                    :
                    Defendants.     :
                                    :
------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/13/15

This case arises from Bernard Madoff's infamous Ponzi scheme.

Plaintiff, The R.W. Grand Lodge of Free & Accepted Masons of

Pennsylvania, purchased shares in a "fund of hedge funds" offered by

Meridian Capital Partners, Inc.  The fund made investments that were

ultimately lost in Madoff's scheme, and plaintiff suffered damages.

Plaintiff now seeks recovery from three Meridian entities, as well as

Meridian director William H. Lawrence, and Meridian's auditor at

relevant times, Ernst & Young LLP, alleging defendants secured plaintiff's investment through fraud.

Plaintiff originally filed this action in the Eastern District of Pennsylvania on May 11, 2009. On August 12, 2009, the case was transferred to the Southern District of New York to facilitate coordination and consolidation with similar cases. On October 21, 2009, the court ordered this case consolidated, for pretrial proceedings, with several other individual and class actions seeking damages from Meridian entities due to the Madoff fraud.

Before the court are two motions to dismiss plaintiff's claims under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. One motion comes from the Meridian entities and William H. Lawrence, and the other motion comes from Ernst & Young.

The motions are granted.

### The Complaint

The following is taken from the complaint. For the purpose of these motions to dismiss, the allegations in the complaint are assumed to be true.

### A. The Parties

Plaintiff is a fraternity branch headquartered in Philadelphia and a non-profit organization. It maintains assets in a Consolidated Fund,

2

which purchased shares in the Meridian Fund, and suffered the losses at issue in this case.  (Compl. ¶ 11.)

Defendant Meridian Capital Partners, Inc. ("Meridian Capital") is an investment manager that offers fund of hedge fund investments to institutional and high net worth investors.  Its offices are in New York City.  (Compl. ¶ 12.)  Defendant Meridian Diversified Fund, Ltd. ("Meridian Fund"), is a Cayman Island investment fund.  It is among the funds offered by Meridian Capital.  (Compl. ¶ 15.)  Defendant Meridian Diversified Fund Management LLC ("Meridian Management") is a Delaware limited liability company that serves as an investment manager.  (Compl. ¶ 16.)

At all relevant times, Meridian Management managed the investments of the Meridian Fund.  (Compl. ¶ 16.)  Meridian Capital, in turn, was the managing member of Meridian Management.  (Compl. ¶ 16.)  And defendant William H. Lawrence was the Chief Executive Officer and Chief Investment Officer of Meridian Capital, overseeing substantially all investment activities and serving as the leader of the firm.  (Compl. ¶ 13.)  Hereinafter, Meridian Capital, Meridian Management, the Meridian Fund, and William H. Lawrence are referred to collectively as the "Meridian defendants."

The Meridian defendants managed investment funds whose strategy was to invest in other funds.  They profited through fees charged

3

to investors.  For example, investors in the Meridian Fund paid annual fees amounting to 1% of their investment principal, and 10% of the gains the Meridian Fund achieved over its previous high-water mark.  (Compl. ¶ 40.)

The complaint alleges that all the Meridian defendants worked in close concert toward common purposes, and therefore may be treated as a group.  (Compl. ¶ 18.)  In support of this conclusion, the complaint explains that the Meridian defendants frequently made representations on behalf of one another, and interacted with clients without making clear the distinctions between the Meridian entities.  Furthermore, Lawrence had access to all information about all of the Meridian entities and exerted control over their public statements and investor reports. For these reasons, the complaint imputes all alleged misrepresentations to the Meridian defendants as a group.  (Compl. ¶¶ 18-23.)

Ernst & Young ("E&Y") is a global professional services firm with a principal place of business in New York, New York.  At relevant times, E&Y served as auditor for the Meridian Fund and issued annual financial reports to the Meridian Fund and its investors.  (Compl. ¶ 24.)

## B. Allegations of Wrongdoing

### i.    Investment With Madoff Feeder Funds

At all relevant times, the Meridian Fund allocated some of its capital to two hedge funds which were "feeder" funds for Madoff's

4

scheme. (Compl. ¶¶ 30-34.) These two funds, both managed by Tremont Group Holdings, Inc., were called the Rye Select Broad Market Portfolio, Ltd. and the Rye Select Broad Market XL Portfolio, Ltd. (hereinafter, the "Rye funds"). The Rye funds invested substantially all of their assets through the wealth management arm of Bernard Madoff's firm, Bernard Madoff Investment Securities LLC ("BMIS"). (Compl. ¶¶ 33-34.) Defendants knew that the Rye funds invested through Madoff and BMIS, but did not disclose that information to plaintiff. (Compl. ¶¶ 33-34.)

BMIS was, as the complaint explains, a fraud. Although BMIS claimed to invest its clients' money using an unusual (yet theoretically possible) strategy called "split-strike conversion," it did not really invest at all. Instead, it placed its clients' money into a bank account and falsified their returns in the manner of a classic Ponzi scheme. (Compl. ¶ 29.) BMIS concealed and sustained its fraud in part by falsifying extremely strong, consistent returns from the early 1990s until the collapse of the scheme in 2008. (Compl. ¶ 29.)

When Madoff's scheme ultimately collapsed in 2008, the Meridian defendants announced that, due to Madoff's fraud, approximately 6-8% of the money in the Meridian Fund would be written off. (Compl. ¶ 138.) The Meridian defendants also disclosed after BMIS's collapse that they had met with Madoff personally, on multiple occasions, to discuss his investment approach. (Compl. ¶ 140.)

### ii.    Fraud Allegations

The complaint states, in conclusory terms:

"During all relevant times, the Meridian Defendants and E&Y carried out a plan, scheme, and course of conduct which was intended to and did: (i) deceive Plaintiff regarding the Meridian Defendants, and each of their business, operations, management and the intrinsic value and performance of [their investments]; and (ii) cause Plaintiff to invest in the Meridian Fund where it would otherwise not have had Plaintiff known the truth about the Meridian Defendants' business practices."

(Compl. ¶ 169.)  More specifically, plaintiff contends that the Meridian defendants induced it to invest through statements that were false or misleading in light of the numerous "red flags" that did or should have alerted the Meridian defendants to the fact that Madoff was running a Ponzi scheme.  (Compl. ¶ 78.)  The complaint adds that, subsequent to plaintiff's initial investment, "[e]very report sent by the Meridian Defendants to Plaintiff contained false and misleading statements." (Compl. ¶ 84.)  Similarly, the complaint states that E&Y submitted to plaintiff misleading audit reports which "turned a blind eye to the existence of several risk factors." (Compl. ¶¶ 149, 162.)

The complaint puts forth a number facts in an effort to support these conclusions.  For example, Meridian Capital director Mark Hurrell solicited plaintiff's initial investment during a May 2006 presentation. (Compl. ¶ 44.)  In that presentation, he stated that the Meridian defendants performed substantial and ongoing due diligence on the

hedge funds in which the Meridian Fund invested. This diligence, Hurrell explained, included quantitative analysis of investment returns based on various technical metrics, as well as qualitative analysis based on personal meetings, legal and accounting analyses, and reference checks. (Compl. ¶¶ 54-55.)  He presented written materials that stated that Meridian's investment process involved (a) screening of external investment managers, and (b) analysis and evaluation of their investment strategies. (Compl. ¶¶ 52-53.)

Meridian Capital's website also asserted that its managers undertook careful due diligence. It provided, for example, that "[p]ortfolios are constructed using a time tested, disciplined methodology focused first on risk management." (Compl. ¶ 36.)

The complaint contends that these and other statements by defendants were false and misleading in light of a litany of "red flags," which defendants never disclosed to plaintiff, and which did or should have alerted defendants to Madoff's fraud. The red flags include the following:

- BMIS had not purchased a security during the 13 years before 2008. (Compl. ¶ 62.)

- BMIS's returns—approximately 10% per year for many consecutive years, delivering good results even when the

markets dipped—were so consistent and strong that they were not believable.  (Compl. ¶ 62.)

- Madoff was extremely secretive.  He pressured investors not to disclose that they invested with him.  He placed his close family members in key positions at his firm.  (Compl. ¶ 62.)

- BMIS was such a small firm that it could not have adequately managed many billions of dollars in assets. (Compl. ¶ 62.)

- Madoff did not provide clients electronic access to his trading records, instead mailing them false paper records.  (Compl. ¶ 62.)

- BMIS avoided filing SEC disclosures of its holdings by purporting to sell all of its holdings for cash at the end of each reporting period.  (Compl. ¶ 62.)

- BMIS employed an obscure auditing firm with only three employees.  Such a tiny firm could not have adequately audited a firm like BMIS, managing billions of dollars. Furthermore, every year since 1993, the tiny accounting firm declared to the American Institute of Certified Public Accountants that it was conducting no audits.  (Compl. ¶ 62.)

8

- Numerous investment professionals suspected that Madoff was a fraud.  For example, investment manager Harry Markopolos lodged complaints with the SEC in 1999 and 2005 that thoroughly detailed his reasons for believing Madoff's returns could not have been achieved with a split-strike conversion strategy and that BMIS was engaged in fraud.  (Compl. ¶ 62.)

- At least three articles in the financial press, including a *Barron's* article, portrayed Madoff as extraordinarily secretive and suspiciously successful.  (Compl. ¶¶ 68-69.)

Furthermore, the Meridian defendants' alleged misrepresentations did not end after plaintiff's initial investment.  Plaintiff first invested $10 million in the Meridian Fund on or around July 1, 2006, several months after Hurrell's presentation.  (Compl. ¶ 79.)  Yet after that, on September 14, 2007, Anthony Cottone, a director of Meridian Capital, made another presentation to plaintiff's trustees.  Cottone reiterated that Meridian carefully screens investment managers and engages in due diligence in its efforts to achieve superior risk-adjusted returns.  He referred to the Rye funds as a "sleep well" investment.  (Compl. ¶¶ 103-110.)  In December 2007 plaintiff purchased an additional $3 million worth of shares in the Meridian Fund.  (Compl. ¶ 137.)

Plaintiff also received quarterly reports on the Meridian Fund's performance, beginning in 2006, which contained misrepresentations concerning the performance of the Meridian Fund and its holdings in the Rye funds. The quarterly reports inaccurately stated the value of plaintiff's investments with Meridian defendants, because the statements reflected the false returns reported by BMIS to the Rye funds. The quarterly reports also contained certain additional representations about the Meridian defendants' diligence. For example, the Q3 2006 report stated, "We are long term investors and do not chase hot returns." (Compl. ¶ 88.) The Q1 2008 report stated, "We have drilled down hard and demanded additional transparency so we can verify both security risk and counterparty risks while watching everyone like a hawk." (Compl. ¶ 119.) The Q3 2008 report stated, with respect to the Rye XL Fund, "The manager entered the fund's split strike conversion strategy in mid-July and remained invested until mid-September. At that point, the manager moved into cash and cash equivalents." (Compl. ¶ 127.) The complaint contends that these statements and similar ones deceived plaintiff as to the nature of the due diligence that the Meridian defendants were performing, and that the Meridian defendants, in light of the red flags of which they were or should have been aware, made these false statements knowingly or recklessly. (Compl. ¶ 130.)

10

The complaint likewise accuses E&Y of numerous intentional false statements. E&Y was the independent auditor for the Meridian Fund. (Compl. ¶ 142.) It was accordingly responsible for ensuring that the Meridian Fund's statements complied with Generally Accepted Auditing Standards ("GAAS"). (Compl. ¶ 144.) E&Y was required to "obtain a sufficient understanding of the entity being audited, and its environment, including its internal control, to assess the risk of material misstatements of the financial statements whether due to error or fraud, and to design the nature, timing, and extent of further audit procedures." (Compl. ¶ 147.)

The complaint asserts that E&Y "turned a blind eye" to the risk factors relating to the Rye funds and BMIS, and accordingly, issued reports that misstated the value of the Meridian Fund's holdings. (Compl. ¶¶ 149, 152-167.) Plaintiff alleges that E&Y knew or should have known of the red flags concerning Madoff, and by extension, the falsehoods in the Rye funds' and the Meridian Fund's financial statements, because E&Y was familiar with Madoff through its audits of other hedge funds that invested with Madoff. (Compl. ¶¶ 150, 162.)

## C. Plaintiff's Claims

Plaintiff asserts two federal claims: first, against all defendants, violation of § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78a *et seq.,* and the Securities and Exchange Commission's Rule 10b-

5, 17 CFR § 240; and second, against the Meridian defendants, violation
of § 20(a) of the Exchange Act.  (Compl. ¶¶ 168-86.)

Additionally, plaintiff asserts nine claims under state law,
including fraud, misrepresentation, negligent misrepresentation, and
violation of §§ 1-401 and 1-501 of the Pennsylvania Securities Act of
1972.  (Compl. ¶¶ 187-241.)  All of the state claims name some or all of
the Meridian defendants.  Among the state claims, only the
misrepresentation and negligent misrepresentation claims name E&Y.

## Motions to Dismiss

On June 14, 2013, the Meridian defendants and E&Y filed motions
to dismiss the complaint under Rules 12(b)(6) and 9(b) of the Federal
Rules of Civil Procedure.  Defendants contend that, due to a litany of
deficiencies, the complaint cannot support any claims against
defendants.  They further allege that the Securities Litigation Uniform
Standards Act ("SLUSA") precludes plaintiff's state law claims.

## Discussion

To survive a motion to dismiss, a plaintiff must plead "enough
facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.
v. Twombly*, 550 U.S. 544, 570 (2007).  Recitals of the elements of a
cause of action, supported by mere conclusory statements, do not satisfy
that standard.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is
plausible where "the pleaded factual content allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663.

## A. Section 10(b) Claim

To state a claim under § 10(b) and Rule 10b-5, "a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [the] injury." *In re Time Warner, Inc. Sec. Litig.*, 9 F.3d 259, 264 (2d Cir. 1993).

Moreover, the claim must meet the heightened pleading standards of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure.  Rule 9(b) requires plaintiff to state the circumstances of a fraud with particularity.  Courts in this circuit find such particularity where a plaintiff specifies the statements alleged to be fraudulent, identifies the speaker, states where and when the statements were made, and explains why the statements were fraudulent. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). The PSLRA further requires that the complaint support a "strong inference" that defendants acted with scienter.  In 10(b) cases, the scienter requirement is not met unless the defendant acted intentionally or recklessly. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319, n. 3 (2007).  An inference of scienter is strong only where the

facts alleged, taken as a whole, show that an inference of scienter is at least as compelling as any opposing inference of nonfraudulent intent. *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 111 (2d Cir. 2009).

### The Complaint Does Not Contain Facts Supporting a Strong Inference That Defendants Subjectively Suspected Madoff was a Fraud

The facts alleged in the complaint, taken as true, do not support the conclusion that defendants in this case made misrepresentations knowingly or recklessly. To be sure, defendants made statements that turned out to be untrue after the facts concerning Madoff's fraud were revealed. But to make out a federal securities claim, the complaint must contain facts supporting a strong inference that defendants knowingly or recklessly made these statements. Instead—notwithstanding plaintiff's conclusory statements of defendants' scienter—the facts in the complaint suggest that defendants were genuinely deceived like so many other Madoff investors, and that they made false or misleading statements without the scienter required to support a federal securities claim.

Indeed, the complaint itself reveals that before BMIS collapsed, many in the investment community believed Madoff was a brilliant money manager. Madoff was "a former chairman of the NASDAQ stock exchange and a high-profile figure on Wall Street." (Compl. ¶ 25.) He

14

had been delivering seemingly excellent returns to many investors since the early 1990s.  (Compl. ¶¶ 29, 68.)

Because Madoff enjoyed such a prestigious reputation, the mere existence of the red flags that plaintiff names in the complaint cannot be assumed to have created actual suspicion, in the minds of defendants, that Madoff was operating a fraud.  To support an inference of scienter, plaintiff must allege facts showing that those red flags were known to defendants, and that they affected defendants' subjective confidence in Madoff.  Such facts do not appear in the complaint.

For example, the complaint contains much detail concerning the red flags about Madoff that were raised in the financial press and in Harry Markopolos' SEC complaints.  (Compl. ¶¶ 70-78.)  However, the complaint does not allege that defendants knew of Harry Markopolos' SEC complaints or read the articles questioning Madoff.

Without alleging facts showing that the defendants actually perceived the red flags, the complaint cannot support a strong inference that the red flags created meaningful doubt about Madoff in the minds of the defendants.  Instead, the complaint supports the opposite inference: that the Meridian defendants were among the many victims of Madoff.

### <u>The Complaint Does Not Support a Strong Inference that the Meridian Defendants Knowingly or Recklessly Misrepresented their Due Diligence</u>

The complaint also fails to support an inference that the Meridian defendants knowingly or recklessly misrepresented their due diligence. Many of the alleged misrepresentations on this subject are non-actionable "puffery." And where such statements are not puffery, the facts in the complaint do not support a strong inference that they amount to knowing or reckless misrepresentations.

For example, the statement that "we are extremely diligent in not being seduced by current 'star performers' with no risk controls" must be regarded as non-actionable puffery. (Compl. ¶ 88.) *See ECA & Local 134 IBEW Joint Pension Trust of Chi. V. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d. Cir. 2009). But even were it not puffery, the facts in the complaint do not support a strong inference that the Meridian defendants knew that the statement was misleading. A more plausible inference can be drawn that, like so many other Madoff victims, they truly thought they were avoiding being seduced.

The complaint refers to repeated claims by the Meridian defendants that they understood the strategies employed by the hedge funds with which they invested. (Compl. ¶¶ 66, 92, 130, 134.) Plaintiff contends that these claims must have been knowing misrepresentations, because had the Meridian defendants truly understood Madoff's

16

purported split-strike conversion strategy and performed competent due diligence, they would have deduced that Madoff's returns were implausible. (Compl. ¶ 130.) But it is more likely that the Meridian defendants simply neglected—like so many Madoff investors—to perform the rigorous analyses that would have revealed the implausibility of Madoff's claimed returns. This does not amount to a knowing misrepresentation.

Finally, the complaint suggests that, if defendants overlooked the many red flags about Madoff, then they must have known they were misleading plaintiff with statements such as: "We verify both security risk and counterparty risks while watching everyone like a hawk." (Compl. ¶ 119.) But more likely, the Meridian defendants believed they were not misleading plaintiff, in light of all the facts. Indeed, the Meridian defendants had met personally with Madoff. (Compl. ¶ 140.) And many other Madoff investors were not alarmed by the red flags. It is therefore not clearly false that the Meridian defendants "verif[ied] security and counterparty risks," and "watch[ed] everyone like a hawk."

As a whole, the complaint does not support an inference—let alone a "strong" inference—that the Meridian defendants thought that their representations were misleading, or in other words, that they had scienter. *See South Cherry Street*, 573 F.3d at 111 (2d Cir. 2009). Since

17

the § 10(b) claim cannot prevail without scienter, it is dismissed against the Meridian defendants.

### The Complaint Does Not Support an Inference that E&Y Acted with Scienter

E&Y's regular audit opinions on the assets of the Meridian Fund contained misstatements because they incorporated the reported values of the Rye funds' holdings.  Plaintiff alleges that these misstatements reflected violations of the accounting rules, and that E&Y—like the Meridian defendants—was or should have been alerted, by various red flags, to the fact that the Rye funds holdings were worthless.  However, for reasons consistent with other rulings on related subject matter, the complaint does not support a strong inference that E&Y made misrepresentations with the required scienter.  *See Meridian Horizon Fund, LP v. Tremont Group Holdings, Inc.*, 747 F. Supp. 2d 406, 412-13 (S.D.N.Y. 2010).

Given that Madoff had a strong reputation before his fraud was unveiled, the mere presence of the red flags described in the complaint cannot support a strong inference that E&Y knew or suspected that the assets invested with him were valueless.  The court has already found that the complaint does not support a strong inference that the red flags led to scienter for the Meridian defendants.  Surely the very same red flags cannot support an inference of scienter for Meridian's auditor, E&Y.

18

Moreover, this case is readily distinguishable from others in which courts have found that "[a]llegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter." *In re AOL Time Warner, Inc. Securities and "ERISA" Litigation*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004).  Namely here, the red flags do not directly concern the audited company, but rather the money manager for a fund in which the audited company had invested.  *See id.* (*quoting Van de Velde v. Coopers & Lybrand*, 899 F. Supp. 731, 736 (D. Mass. 1995) ("A complaint will usually survive a motion to dismiss if plaintiffs have alleged the existence of 'red flags' sufficiently attention-grabbing to have alerted a reasonable auditor to the *audited company's* shenanigans.") (emphasis added)).

The complaint mentions one reason why E&Y might have known of Madoff's fraud, even if the Meridian defendants did not.  Namely, E&Y audited numerous other funds that invested money with Madoff and BMIS, including the Rye funds.  (Compl. ¶¶ 149, 150, 166.)  But this is still not enough to support a strong inference of scienter.  E&Y did not audit Madoff or BMIS, and plaintiff does not plausibly allege that E&Y gained actual knowledge of the fraud from its audits of other funds.  Since the claim cannot prevail without scienter, the § 10(b) claim against E&Y is dismissed.

## B. Section 20(a) Claim

Having failed to state a claim under § 10(b) of the Exchange Act, plaintiff's claims under § 20(a) must also fail.  Because plaintiff has not pleaded a federal securities fraud claim upon which relief may be granted, there can be no control person liability under § 20(a).  The claim is dismissed.

## C. State Law Claims

Plaintiff brings the remaining claims in the complaint, claims III through XI, under state law.  Compl. ¶¶ 187-241.  These claims face the threshold question of whether SLUSA, a federal statute, precludes them. If so, no relief can be granted and dismissal is appropriate.  Fed. R. Civ. P. 12(b)(6).

SLUSA prohibits plaintiffs from bringing state claims in certain securities actions.  15 U.S.C. §78bb(f); *Chadbourne & Parke LLP v. Troice*, 134 S. Ct. 1058, 1062 (2014).  Specifically, SLUSA requires dismissal of all state claims in a "covered class action" concerning deception "in connection with the purchase or sale of a covered security."  15 U.S.C. §78bb(f).

It is clear from controlling precedent that the claims here concern deception in connection with the purchase or sale of covered securities. *See In re Herald, Primeo, and Thema*, 730 F.3d 112, 118-19 (2d Cir. 2013) ("Herald I") (per curiam) (finding that claims involving investments

in foreign Madoff feeder funds met the "in connection with a covered security" requirement under SLUSA); *In re Herald, Primeo, and Thema*, 753 F.3d 110, 112-13 (2d Cir. 2014) ("Herald II") (confirming that Herald I remains good law in light of the Supreme Court's ruling in *Troice*).

But plaintiff attempts to escape preclusion by SLUSA by arguing that the action is not part of a covered class action.  The court now turns to that question.

Under SLUSA, the term "covered class action" includes:

(ii) any group of lawsuits filed in or pending in the same court and involving common questions of law or fact, in which—

(I) damages are sought on behalf of more than 50 persons; and

(II) the lawsuits are joined, consolidated, or otherwise proceed as a single action for any purpose.

15 U.S.C. §78bb(f)(5)(B)

Plaintiff argues that SLUSA does not preclude the state claims here, because plaintiff's case is an individual action, distinct from other cases with which it has been consolidated for pretrial proceedings.  Defendants argue that the case is nonetheless a covered class action under SLUSA because it has been consolidated for pretrial proceedings with a covered class action.  *See* Consolidation Order, No. 1:09-MD-2082 (S.D.N.Y. Oct. 22, 2009) (Dkt. 8).  The parties do not dispute that the group of lawsuits consolidated before the court for pretrial proceedings—of which the instant case is one—seek damages on behalf of more than 50 persons.

21

Courts in this circuit have clearly answered the question of whether the "group of lawsuits" language of 15 U.S.C. §78bb(f)(5)(B)(ii) covers individual actions that would not be covered but for their consolidation with other cases in multidistrict proceedings. *See, e.g., In re Lehman Bros. Sec. and ERISA Litig.*, No. 09 MD 2017, 2012 WL 6603321, at *1-3 (S.D.N.Y. Dec. 17, 2012); *In re Refco Sec. Litig.*, 859 F. Supp. 2d 644, 648-49 (S.D.N.Y 2012). They have held that an individual action is covered under SLUSA if it is grouped, through a formal consolidation order, with a covered action or group of actions with which it shares common questions of law or fact. *See In re Lehman Bros.*, 2012 WL 6603321 at *2 ("[T]he language of [15 U.S.C. §78bb(f)(5)(B)(ii)] is crystal clear . . . . [E]ven if a transfer by the Multidistrict Panel were not in itself sufficient to trigger SLUSA, such a transfer combined with a formal consolidation order certainly would be."); *In re Refco,* 859 F. Supp. 2d at 649 ("This MDL proceeding coordinates discovery and other pretrial proceedings, and the actions in it are accordingly proceeding as a single action for numerous purposes."). These decisions go so far as to note that the dismissal of state claims in individual actions grouped for multidistrict proceedings undoubtedly reflects Congress's intent. *See Gordon Partners v. Blumenthal*, No. 02 Civ. 7377(LAK)(AJP), 2007 WL 431864, at *18 (S.D.N.Y. Feb. 9, 2007) (noting Congress's broad language

22

in 15 U.S.C. §78bb(f)(5)(B)(ii)(II) and holding that consolidation for discovery purposes rendered an action a covered class action).

This court formally consolidated plaintiff's action with a covered class action before the same court: *Pension Trust Fund for Operating Engineers, et al., v. Meridian Diversified Fund Management, et al.*, No. 09 Civ. 3955.  The order was unambiguous: "[P]ursuant to Fed. R. Civ. P. 42(a) . . . these cases should be consolidated for pretrial proceedings." Consolidation Order (Dkt. 8).  This amounted to a finding that, pursuant to Rule 42(a), the cases shared common issues of law and fact. Accordingly, there can be little doubt that the instant case is a covered class action under SLUSA.

Plaintiff points to certain language the court used in a hearing to buttress its case that it brings an individual action, distinct from the covered class action with which it was consolidated.  None of that undermines the fact that the consolidation alone suffices to make this case a "covered class action" under SLUSA.

Since the other requirements for SLUSA's application are clearly met, the court finds that claims III through XI are precluded. Accordingly, the court need not reach the merits of those claims.

## Conclusion

The motions to dismiss are granted.  The clerk is instructed to resolve the motions numbered 32, 36, and 37 in case number 09 CV

7099 and the motions numbered 115 and 116 in case number 09 MD

2082.

Dated: New York, New York
      March 13, 2015

SO ORDERED

Thomas P. Griesa
U.S.D.J.